**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re:  GERALD COLEY, | : | **Chapter 7** |
| | : | |
| **Debtor** | : | **Bky.  No. 09-14999 ELF** |
| _____ | : | |
| | : | |
| **GMAC INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **GERALD COLEY,** | : | |
| | : | |
| **Defendant** | : | **Adv.  No. 09-0307** |
| | : | |

# M E M O R A N D U M   O P I N I O N

### I.

Gerald Coley ("the Debtor") filed a voluntary petition under chapter 7 of the Bankruptcy Code on July 8, 2009.  In his bankruptcy schedules, the Debtor listed forty-six (46) unsecured debts totaling more than $2.3 million.  Among the scheduled creditors is GMAC, Inc. ("GMAC"), the plaintiff in this adversary proceeding.  GMAC is the Debtor's largest creditor, having obtained an $869,429.97 judgment against him prior to the commencement of the bankruptcy case.

GMAC initiated this adversary proceeding by filing a Complaint on October 6, 2009.  In the Complaint, GMAC:

> (1) objected to the Debtor's discharge under §727(a)(2)(A) and 727(a)(5) and
>
> (2) asserted that its claim against the Debtor is nondischargeable under 11 U.S.C. §§523(a)(2)(A), 523(a)(2)(B), 523(a)(4) and 523(a)(6).

The Debtor filed a pro se Answer to the Complaint on November 3, 2009.[1]

Before the court is GMAC's Motion for Summary Judgment ("the Motion"), which was filed on April 6, 2010. The Debtor filed a pro se Response to the Motion on May 6, 2010.

As detailed below, while the Debtor has not offered much in the way of evidence in response to the Motion, neither has GMAC offered much evidence in support of the Motion. Based on the summary judgment record, the Motion will denied in its entirety because GMAC has not offered evidence sufficient to meet its burden of proof with respect to at least one element of each of its claims.[2]

## II.

### A.

GMAC styles its Motion as one for summary judgment. However, GMAC did not submit any evidentiary matter in support of the Motion, relying exclusively on admissions in the Debtor's Answer to the Complaint.

In the Motion, GMAC asserts that the following facts are undisputed:[3]

---

[1] The Debtor filed his pro se Answer to the Complaint while he was represented by counsel. However, by order dated December 3, 2009, and with the Debtor's consent, the court granted the Debtor's bankruptcy counsel, Warren S. Wolf, leave to withdraw his appearance in this adversary proceeding. Mr. Wolf continues to represent the Debtor in the "main" bankruptcy case.

[2] There is one exception to this statement. As explained in Part V., infra, the Debtor has raised an issue of material fact with respect to one element of GMAC's §523(a)(2)(A) claim and §523(a)(2)(B) claim.

[3] Following each of GMAC's assertions, I include a citation to the section(s) or paragraph(s) of the Complaint and Answer upon which GMAC presumably relies.

1.  Exton Motors, Inc. ("Exton Motors") is an automobile dealership that previously operated in

    Exton, Pennsylvania. (Complaint ¶2; Answer ¶2).

2.  The Debtor was the owner, president and principal of Exton Motors and controlled its

    operations. (Complaint ¶3; Answer ¶3).

3.  In connection with and as a condition of GMAC providing Exton Motors with financing for

    the dealership's inventory of new and certain used motor vehicles, Exton Motors executed

    and delivered to GMAC an agreement dated April 11, 2001, titled "Wholesale Security

    Agreement"), and certain amendments thereto (collectively, "the WSA"). The WSA

    provided, in relevant part, that the dealer agreed that as each vehicle was sold or leased, he

    would faithfully and promptly remit to GMAC the amount it advanced or became obligated

    to advance on the dealer's behalf to the manufacturer, distributor or seller, with interest at

    the designated rate per annum then in effect under the GMAC Wholesale Plan.[4]  (Complaint

    ¶4; Answer ¶4).

4.  On April 11, 2001, the Debtor executed a Guaranty by which he unconditionally, personally

    guaranteed the payment of all of Exton Motor's indebtedness to GMAC (the "Guaranty").

---

[4]     The WSA states that Exton Motors "acquire[s] new and used cars, trucks and chassis . . .
from manufacturers or distributors" in the course of its business and would like GMAC "to finance the
acquisition of such vehicles and to pay the manufacturers or distributors therefor." (Complaint, Ex. A, at
1; see also Answer, ¶4 (admitting Ex. A is a true and correct copy of the WSA)).  In the WSA, Exton
Motors grants GMAC a security interest in "new vehicles held for sale or lease and used vehicles
acquired from manufacturers and distributors and held for sale or lease; and all vehicles of like kinds or
types . . . owned or . . . acquired . . . by way of replacement, substitution, addition or otherwise, and . . .
all proceeds of such vehicles, including insurance proceeds." (See Complaint, Ex. A, at 1; Answer ¶4).
The WSA provides that "as each vehicle is sold, or leased," Exton Motors "will faithfully and promptly
remit" to GMAC the amount GMAC advanced or became obligated to advance to the manufacturer, with
interest.

        The WSA incorporates by reference a document identified as "the GMAC Wholesale
Plan." (Complaint, Ex. A. at 1; Answer ¶4).  The GMAC Wholesale Plan is not in the record.

(Complaint ¶5; Answer ¶5).

5.   In April 2007, the Debtor provided a personal financial statement to GMAC in

consideration for and in connection with: (a) GMAC's continued provision of financing to

Exton Motors ("the April 2007 Financial Statement.") and (b) his personal guarantee of

Exton Motors' debt to GMAC.  (Complaint ¶6; Answer ¶6).

6.   The April 2007 Financial Statement represented, in relevant part, that the Debtor had assets

worth $842,800.00 and that the Debtor's sole liability was a mortgage on his personal

residence with a present balance of $430,000.00.  The statement listed no contingent

liabilities.  In signing the April 2007 Financial Statement, the Debtor certified that he

understood that GMAC was relying on the information provided therein in deciding to grant

or continue credit and he represented and warranted that the information provided was true

and correct.(Complaint ¶6; Answer ¶6).

7.   On or about November 3, 2008, in the course of a routine audit, GMAC discovered that

Exton Motors had sold a substantial number of vehicles "floor planned" by GMAC,[5]

converted the proceeds and failed to pay GMAC.  (Complaint ¶7; Answer ¶7).

8.   On or about November 7, 2008, Exton Motors, the Debtor and GMAC entered into a

forbearance agreement (the "Forbearance Agreement").  In the Forbearance Agreement,

---

[5]        GMAC has not explained what the expression "floor planned" means.  There are many
reported cases involving "floor plan" financial arrangements between creditors providing inventory
financing to retailers.  One court described the practice in the automobile industry as follows:

> A floor plan is a method of financing the automobiles. Under a floor plan, a
> lending institution provides financing for inventory of vehicles and holds a
> chattel mortgage on each vehicle. When the car dealer sells the car, the institution
> is paid.

In re Cummins, 166 B.R. 338, 348 n.8 (Bankr. W.D. Ark. 1994) (citation omitted).

GMAC agreed to forbear from exercising its rights for an agreed period of time, while

Exton Motors acknowledged that it was in default under the WSA for failure to pay GMAC

for vehicles sold out of trust  (Complaint ¶8; Answer ¶8).[6]

9.    Later, GMAC extended the term of the Forbearance Agreement and in consideration

thereof, in December 2008, the Debtor provided GMAC with another signed, personal

financial statement ("the December 2008 Financial Statement").  In the December 2008

Financial Statement, the Debtor listed personal assets in the amount of $957,300.00,

including $200,000.00 in furniture.  The Debtor stated that his only liability was a mortgage

on his personal residence in the amount of $635,000.00.  The Debtor listed no contingent

liabilities. The Debtor also certified that the information therein was a true and correct

showing of his financial condition.  (Complaint ¶9; Answer ¶9).

10.   The Forbearance Agreement contained a warrant of attorney.  (Complaint ¶10; Answer

¶10).

11.   On April 27, 2009, GMAC confessed judgment against Exton Motors and the Debtor in the

amount of $869,427.97.  (Complaint ¶10; Answer ¶10).

12.   On July 8, 2009, the Debtor filed a petition under Chapter 7 of Bankruptcy Code.

(Complaint ¶11; Answer ¶11).

13.   In his bankruptcy schedules, the Debtor listed as assets his personal residence, with a value

---

[6]      The Forbearance Agreement provided, in relevant part, that "[Exton Motors] and [the
Debtor], respectively, expressly, and affirmatively waive and release GMAC and all of its directors,
officers, agents, employees, and subsidiaries (collectively, "GMAC Parties") from any and all past and
present claims, defenses, causes of action, or damages arising from any and all dealings or relationships
involving GMAC and any GMAC Parties on one hand and [Exton Motors] and the [Debtor] on the other
hand." (Complaint, Ex. D ¶I; Answer ¶8 (admitting Ex. D is a true and correct copy of the Forbearance
Agreement)).

-5-

of $670,000.00, as well as various items of personal property valued at a total of

$11,158.75. This figure included furniture, electronics and kitchen items valued at

$3,050.00.  (Complaint ¶12; Answer ¶12).

14. The Debtor scheduled total liabilities in the amount of $3,455,669.70.  That total included

GMAC's confessed judgment in the amount of $869,427.97.  (Complaint ¶13; Answer ¶13).

## B.

In his Response to the Motion, the Debtor admits all of the above allegations, except for

Paragraph Nos. 6, 7 and 8.[7]  However, his denials of Paragraphs 6-8 are inconsistent with the

earlier admissions in his Answer to the Complaint.  For purposes of resolving the Motion, I will

assume <u>arguendo</u> that the Debtor is bound by the admissions in the Answer to the Complaint.[8]

In his Response to the Motion, the Debtor also states that he "did not defraud nor intend

to defraud GMAC at any time during their relationship  –  especially upon filling out the GMAC

credit statement" and that:

> At the time of the filling out of the GMAC statement, some of the
> property/furniture was brand new and was insured for FULL RETAIL VALUE -

---

[7]     Paragraph 6 relates to the April 2007 Financial Statement, the contents of that Financial
Statement and the Debtor's alleged certification regarding GMAC's reliance and the truthfulness of the
information provided in the Financial Statement.

        Paragraph 7 relates to GMAC's alleged audit on November 3, 2008 and the results of that
audit.

        Paragraph 8 relates to the terms of the  alleged Forbearance Agreement.

[8]     I leave for a later day a determination, if necessary, whether the Debtor may amend his
Answer to the Complaint and contest at trial the facts admitted in his Answer to the Complaint.

NOT Fair Market Value nor Bankruptcy Distressed Value.

At the time of filling out the Bankruptcy Petition, at least 10-20% of the same
property as listed in the prior GMAC statement was damaged and discarded. The
balance of the property was now 17 months older and was in "worn condition". I
was instructed in my Bankruptcy Petition to reduce the value to a "distressed
bankruptcy value" - which - upon my research, was to value this property at 5%
to 10% of its FULL RETAIL VALUE - the remaining furniture/property at the
time of Bankruptcy Petition was $150,000 and 10% of that value is what I stated.

Finally, the Debtor contends that he signed the Forbearance Agreement "under duress

[and] without legal counsel."

## III.

The standard for evaluating a summary judgment motion is well established and has

been stated in numerous written opinions in this district.[9]  Pursuant to Fed. R. Civ. P. 56(c),

summary judgment should be granted when the "pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[10]

Before a motion for summary judgment may be granted, the court must find that the

motion alleges facts that, if proven at trial, would require a directed verdict in favor of the

movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  If the movant

---

[9]     E.g., In re Pure Weight Loss, Inc., 2009 WL 3769671, at *3-4 (Bankr. E.D. Pa. Nov. 10,
2009) (per Raslavich, Ch. J.); In re Total Containment, Inc., 2008 WL 682455, at *1-3 (Bankr. E.D. Pa.
Mar. 5, 2008) (per Fox, J.);  In re Lilly, 2006 WL 3859128, at *2 (Bankr. E.D. Pa. Oct. 27, 2006) (per
FitzSimon, J.); In re LaCheen, 2005 WL 1155257, at *2 (Bankr. E.D. Pa. Apr. 28, 2005) (per Sigmund,
J.); In re Lewis, 290 B.R. 541, 545 (Bankr. E.D. Pa. 2003) (per Carey, J.).

[10]     Fed. R. Civ. P. 56 is applicable to this adversary proceeding by operation of Fed. R.
Bankr. P. 7056.

meets this initial burden, the responding party may not rest on his or her pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986). Such evidence must be sufficient to support a factfinder's factual determination in favor of the nonmoving party. Anderson, 477 U.S. at 250. Evidence that merely raises some metaphysical doubt regarding the validity of a material facts is insufficient. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In considering the evidentiary matter submitted in support of and in opposition to a summary judgment motion, the court's role is not to weigh the evidence, but only to determine whether there is a disputed, material fact for determination at trial. Anderson, 477 U.S. at 247-50. A dispute about a "material" fact is "genuine" only if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. Id. at 248. All reasonable inferences must be drawn in favor of the nonmoving party and against the movant. U.S. v. 717 S. Woodward St., 2 F.3d 529, 533 (3d Cir. 1993).

The parties' respective burdens of proof also play a role in determining the merits of a summary judgment motion.

> [W]here the movant is the defendant, or the party without the burden of proof on the underlying claim, the movant still has the initial burden of showing the court the absence of a genuine issue of material fact, but . . . this does not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. In contrast, where . . . "the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent." National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir.1992).

In re Newman,304 B.R. 188, 193 (Bankr. E.D. Pa. 2002) (quoting Adams v. Consol. Rail Corp.,

-8-

1994 WL 383633, *1-*2 (E.D. Pa. July 22, 1994)).  Thus, for GMAC to prevail on its Motion, it

must demonstrate that material facts are not in dispute and there is an absence of evidence to

create a triable issue regarding every necessary element of its claims.

## IV.

Under §727(a) of the Bankruptcy Code, an individual chapter 7 debtor is entitled to a

discharge unless one of a number of specified grounds for denial of a debtor's discharge applies.

If a debtor is entitled to a discharge under §727(a), §523(a) provides that certain debts are

excepted from the general discharge.

In this proceeding, I begin by addressing the two grounds on which GMAC objects to the

Debtor's discharge under §727(a).  I do so because the denial of discharge under §727(a) provides

more expansive relief that would render it unnecessary to consider GMAC's §523(a) claims.  The

converse, however, is not true in an adversary proceeding in which a creditor has raised claims

under both §523(a) and §727(a).  In other words, while a successful §727 claim resulting in a

denial of discharge makes it unnecessary to consider a creditor's §523(a) nondischargeability

claims, if a creditor is successful in obtaining a nondischargeability determination under §523(a),

it must nonetheless continue to pursue its pending objection to discharge under §727(a).  This is

so because a creditor who initiates an objection to discharge under 11 U.S.C. §727(a) does so on

behalf of all creditors and "loses the ability to act solely in its own interest."  In re Childs, 2006

WL 6508183, at *4-5 (Bankr. N.D. Tex. Mar. 30, 2006) (citing Young v. Higbee Co., 324 U.S.

204, 212-13 (1945)), aff'd 2007 WL 92392 (N.D. Tex. Jan 12, 2007)).

**A.**

**1.**

Section 727(a)(2)(A) of the Bankruptcy Code bars the entry of a discharge if:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed —
>
> > (A) property of the debtor, within one year before the date of the filing of the petition . . . .

11 U.S.C. §727(a)(2)(A).

Denial of discharge is considered a harsh remedy that is "not to be taken lightly." Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993). Under §727(a)(2)(A), a party seeking to bar a debtor's discharge must show:

> 1. an act, such as a transfer or concealment of property in which the debtor has a direct proprietary interest;
>
> 2. the debtor's subjective intent to hinder, delay, or defraud a creditor; and
>
> 3. that such act and the debtor's subjective intent occurred within the one year period preceding the filing of the bankruptcy petition.

See id.; In re Spitko, 357 B.R. 272, 299 (Bankr. E.D. Pa. 2006); accord In re DiLoreto, 266 Fed. Appx. 140, 144 (3d Cir. 2008) (nonprecedential). The plaintiff bears the burden of proving these three requirements by a preponderance of the evidence. Spitko, 357 B.R. at 298; In re Kisberg, 150 B.R. 354, 357 (Bankr. M.D. Pa.1992).

**2.**

In its Memorandum of Law in support of the Motion, GMAC does not articulate how the

-10-

undisputed facts satisfy the elements for denial of discharge under §727(a)(2)(A), apparently

assuming that it is self-evident that the asserted undisputed facts satisfy each element of its

claim.[11]  My review of the record leads me to conclude that GMAC's request for summary

judgment under §727(a)(2)(A) must be denied for two reasons.

First, GMAC has not established that the property transfers on which GMAC's claim is

based occurred within one year before the filing of the Debtor's bankruptcy petition.  The

bankruptcy petition was filed on July 8, 2009.  To be actionable under §727(a)(2)(A), the

transfers must have occurred within one year of that date.  The record suggests only that GMAC

learned in early November 2008 that Exton Motors had sold a substantial number of vehicles

without promptly remitting to GMAC, in accordance with the parties' agreement, the amount

GMAC had advanced or became obligated to advance to the manufacturer.  Nothing in the record

indicates whether any of the sales and concomitant failure to remit proceeds occurred on or after

July 8, 2008 (i.e., within the year prior to the filing of the bankruptcy case).

Second, there is nothing in the record that supports a factual finding that there was a

transfer of property by the Debtor as required by §727(a)(2)(A).

---

[11]      In its written submission, GMAC does address two legal issues.

      The first issue GMAC addresses is whether the misappropriation of a secured creditor's
collateral can give rise to a denial of a debtor's discharge for the purposes of §727(a)(2)(A).  GMAC cites
In re Burnside, 209 B.R. 867 (Bankr. N.D. Ohio 1997) for the proposition that actions to hinder, delay
and defraud a secured creditor are encompassed by §727(a)(2)(A).  There are cases to the contrary.  E.g.,
In re Jeffries, 378 B.R. 248, 253 (Bankr. W.D. Mo. 2007) (when property is fully-encumbered it is not
"property of the debtor" within the meaning of §727(a)(2)(A)).  Because I am denying GMAC's request
for summary judgment on its §727(a)(2)(A) claim on other grounds, I need not decide this issue.

      The second legal issue is whether an individual debtor may be denied a discharge under
§727(a)(2)(A) if:  (1) the debtor controls a business entity and (2) the entity transfers or conceals property
that serves as a collateral for a creditor's claim, even though the property is owned by the entity rather
than the individual debtor.  I discuss that second issue below and rule adversely to GMAC on the
question.

The Complaint and the Motion both appear to be premised primarily on the "fact" that the vehicles sold out of trust and the proceeds thereof were property of Exton Motors. The record suggests that the indebtedness arises from a credit arrangement between GMAC and Exton Motors (as principal obligor), with the Debtor acting as a guarantor. The most natural inference from the limited record is that Exton Motors, an automobile dealership, owned the vehicles and the proceeds derived from their sale (subject to the WSA).

Apparently based on the premise that the transferred property was that of Exton Motors,[12] GMAC argues that an individual debtor may be denied a discharge under §727(a)(2)(A) if: (1) the debtor controls a business entity and (2) the entity transfers or conceals property that serves as a collateral for a creditor's claim, even though the property is owned by the entity rather than the individual debtor. In support of this argument, GMAC cites In re Adams, 31 F.3d 389, 394 (6th Cir. 1994); see also In re Riley, 2004 WL 2370640 (Bankr. D. Haw. Apr. 20, 2004) (involving transfer of partnership property to a corporation). There are cases to the contrary. E.g., In re Wagner, 305 B.R. 472, 475-76 (B.A.P. 8th Cir. 2004); Spitko, 357 B.R. at 299.

Having reviewed the competing lines of cases, I am persuaded that §727(a)(2)(A), construed narrowly,[13] does not support the denial of an individual's bankruptcy discharge based on transfer or concealment of property if the debtor lacks an ownership interest in the transferred

---

[12]    Based on the WSA, GMAC also contends that the sale proceeds constituted its property (presumably not the property of either Exton Motors or the Debtor). In making this argument, GMAC does not articulate how §727(a)(2)(A) would apply to the Debtor based on a disposition of assets owned by GMAC.

[13]    See Rosen, 996 F.2d at 1531 (§727 is construed "in favor of the debtor"); In re Raeder, 409 B.R. 373, 379 (Bankr. N.D. W. Va. 2009) (same).

-12-

property − at least in the absence of grounds to treat the entity as the debtor's alter ego.  In this

regard, Judge Fox's analysis in <u>Spitko</u> is compelling:

> According to the plain language of the statute, there must be a disposition of "property of the debtor."  Relying on this language, courts have recognized that section 727(a)(2)(A) is concerned with the disposition of property in which the debtor has a "direct proprietary interest."
>
> When a corporation is a bona fide entity distinct from an individual debtor-shareholder, courts have applied the above-stated principle to hold that transfers of property belonging to the corporation are outside the scope of section 727(a)(2)(A). . . .  Even though a debtor may have caused a corporation to fraudulently transfer assets, that conduct does not support denial of discharge because the debtor has not transferred his own property.

357 B.R. at 299 (internal quotation marks and citations omitted).

Based on the reasoning and holding of <u>Spitko</u> and on the present record, I conclude that

GMAC has not established the "property of the debtor" element under §727(a)(2)(A), thus

precluding summary judgment.[14]


## B.

GMAC also requests denial of the Debtor's discharge under 11 U.S.C. §727(a)(5).

Section 727(a)(5) provides for the denial of a debtor's discharge if "the debtor has failed to

---

[14]    Given my legal conclusions described in the text above, if the record established indisputably that the property transferred was that of either Exton Motors or GMAC, it might be appropriate to enter summary judgment <u>against</u> GMAC on its §727(a)(2)(A) claim.  <u>See, e.g.</u>, <u>Western World Ins. Co. v. Reliance Ins. Co.</u>, 892 F.Supp. 659, 661 (M.D. Pa. 1995) (the weight of authority is that summary judgment may be granted in favor of a responding party even though the respondent has not filed a formal cross-motion under Rule 56).   As discussed earlier, it appears most likely that one of those entities "owned" the transferred property.  However, because the record is not conclusive on the ownership issue and I cannot rule out the possibility that GMAC may prove that the property transferred was the Debtor's property, the entry of summary judgment in the Debtor's favor is inappropriate at this time.

explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . . ." 11 U.S.C. §727(a)(5).

Under §727(a)(5), courts employ a burden shifting approach. In re Sendecky, 283 B.R. 760, 766 (B.A.P. 8th Cir. 2002). The objecting party must first make a showing that the debtor "at one time owned substantial and identifiable assets that are no longer available to his creditors." In re Wasserman, 332 B.R. 325, 333 (Bankr. N.D. Ill. 2005). Once that burden has been satisfied, the debtor has the burden of presenting a "satisfactory explanation" for the unavailable assets. Id. The bankruptcy court has discretion in determining what constitutes a "satisfactory" explanation for the loss of assets. In re Mezvinsky, 265 B.R. 681, 689 (Bankr. E.D. Pa. 2001). In making this assessment, the court does not concern itself with the propriety of the disposition of the assets, but only whether the explanation is satisfactory. The explanation must convince the judge that the explanation is worthy of belief. Id. "The explanation must appear reasonable such that the court no longer wonders what happened to the assets." In re Shepherd, 2005 WL 4147868, at *3  (Bankr. D. Kan Oct. 7, 2005) (quoting Matter of D'Agnese, 86 F.3d 732, 734 (7th Cir. 1996)). At minimum, a satisfactory explanation must consist of more than "'vague, indefinite, and uncorroborated assertions.'" Shepherd, 2005 WL 4147868, at *3 (citation omitted); Sendecky, 283 B.R. at 766.

In its Memorandum of Law, GMAC provides little guidance regarding the precise basis of its §727(a)(5) claim, stating only that the Debtor "has failed to explain the differences in the increase of liabilities or the decrease of assets, aside from the vague conclusory statement that distressed bankruptcy value was used in preparing the bankruptcy petition." GMAC Mem. of Law at 9.

-14-

Based on my comparison of the April 2007 and December 2008 Financial Statements with the Debtor's bankruptcy schedules, I infer that GMAC is referring to two (2) diminished assets:

1. The April 2007 Financial Disclosure Statement disclosed $152,800.00 in "cash and short-term investments" and marketable "stocks and bonds" ("the Cash & Investments"),[15] while the Debtor's bankruptcy Schedule B disclosed only $5,308.75 in cash or amounts in depository institutions and no assets in the form of stocks, bonds, partnership interests, IRA, 401K or other pension interests;

2. The December 2008 Financial Disclosure Statement disclosed $200,000.00 in "furniture,"[16] while the Debtor's bankruptcy Schedule B disclosed household goods and furnishing with a current value of only $3,050.00.

With respect to the asserted failure to explain the loss of the Cash & Investments,[17] I conclude that GMAC has not met its initial burden of identifying substantial and identifiable assets that are no longer available to the Debtor's creditors. In Schedule A of the April 2007

---

[15]     In his April 2007 Financial Statement, the Debtor broke down this number as follows. As to cash and short term investments, he listed:

| | |
|---|---|
| Harris Insight | $3,500.00 |
| First National West | $5,000.00 |
| 401k | $125,000.00 |
| Wachovia | $7,500.00 |
| **TOTAL** | **$141,000.00** |

With respect to stocks and bonds, the Debtor listed:

| | |
|---|---|
| Lucent (3000 shares) | $9,200.00 market value |
| Agere Sys (1000 shares) | $2,000.00 market value |
| **TOTAL** | **$11,800.00** |

See Complaint, Ex. C, at 4.

[16]     See Complaint ¶ 9 & Ex. E; Answer ¶9 (admitting Ex. E is a true and correct copy of the December 2008 Financial Statement).

[17]     I note that in the December 2008 Financial Statement, the Debtor disclosed significantly less "cash" (approximately $11,000.00) compared to the April 2007 Financial Statement ($152,800.00). However, the mere fact that the dimunition was disclosed pre-bankruptcy is not an explanation for the "loss of assets." See 11 U.S.C. §727(a)(5).

-15-

Financial Statement, the Debtor disclosed that $125,000.00 of the $152,800.00 in Cash &

Investments was an interest in a 401K plan. That asset was not available to the Debtor's creditors

in April 2007. See 42 Pa. Cons. Stat. Ann.§8124(b); In re Bellwoar, 299 B.R. 369, 371 (Bankr.

E.D. Pa. 2003). The remaining difference between the value of the Cash & Investments disclosed

in April 2007 and the assets disclosed in the Debtor's bankruptcy schedules is approximately

$27,800.00. While in some factual circumstances the unexplained loss of $27,800.00 in assets

may well support the denial of discharge, in the factual context of this case (a case involving

liabilities exceeding $2.3 million and the passage of more than two years between the disclosure

of the assets and the commencement of the case) and based on the sparse record available, I am

not persuaded that the discrepancy is sufficiently substantial as to warrant the entry of summary

judgment as a matter of law.[18]

Also, summary judgment based on the discrepancy between the disclosed value of the

furniture in the December 2008 Financial Statement and the Debtor's bankruptcy schedules is

precluded the existence of a disputed issue of material fact. The Debtor disputes that there has

been a loss of assets, asserting that the discrepancy is explained by depreciation and differing

methods of valuation.[19] The strength of the Debtor's explanation cannot be assessed at the

---

[18]    I do not rule out the possibility of denying the Debtor's discharge under §727(a)(5)
based on the unexplained loss of $27,800.00 based on the record developed at trial.

[19]    I am cognizant that the Debtor's Response to the Motion on this point did not comply
with the formal requirement that it be in affidavit form. See Fed. R. Civ. P. 56(e). However, in light of
his pro se status, I will overlook this requirement in the interest of justice. See, e.g., Everett v. Donate,
2010 WL 1253493, at *1 (M.D. Pa. Mar. 24 2010) (construing pro se plaintiff's informal letter as
sufficient to oppose summary judgment motion given plaintiff's pro se status); Benckini v. Hawk, 654 F.
Supp. 2d 310, 316 n.1 (E.D. Pa. 2009) (pro se litigants are held to "less stringent standards" than trained
counsel) (citing Haines v. Kerner, 404 U.S. 519, 520 (1972)). But see Jackson v. Beard, 2009 WL
(continued...)

summary judgment stage.

## V.

I turn next to the §523(a) nondischargeability claims.

## A.

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
. . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ." 11 U.S.C. §523(a)(2)(A). To prevail on a complaint brought under §523(a)(2)(A), a creditor bears the burden of proving the following elements by a preponderance of the evidence:

1.  the debtor made a material representation of fact that he or she knew at the time was false or contrary to his or her true intentions;[20]

2.  the debtor made the representation with the intent and purpose of deceiving the creditor;

3.  the creditor justifiably relied on the such representation; and

---

[19](...continued)
3147852, at *4 (E.D. Pa. Sept. 29, 2009) (a pro se plaintiff is not excused from setting forth facts sufficient to survive summary judgment), aff'd, 2010 WL 538057 (3d Cir. Feb. 17, 2010).

[20]     A creditor may also succeed in establishing that a debt is nondischargeable under §523(a)(2)(A) by proving that the debtor failed to disclose a material fact. "Deceit, deliberate nondisclosure, or the omission of material facts [may] render[] a debtor as culpable as an intentional false affirmation." In re George, 1991 WL 208818, at *5 (W.D. Pa. Oct. 8, 1991); see also In re Docteroff, 133 F.3d 210, 216 (3d Cir. 1997) (reasoning that finding of fraud for purposes of §523(a)(2)(A) may be predicated on debtor's failure to disclose material fact).

-17-

    4.   the creditor suffered a loss or damages as a proximate cause of the false
        representation or act.

See, e.g., In re Kishbaugh, 399 B.R. 419, 425 (Bankr. M.D. Pa. 2009); In re Antonious, 358 B.R.

172, 182 (Bankr. E.D. Pa. 2006); In re Glunk, 343 B.R. 754, 759 (Bankr. E.D. Pa. 2006).

       GMAC's Motion alleges nothing other than that "as each vehicle was sold or leased, [the

Debtor agreed to] faithfully and promptly remit to GMAC the amount it advanced or became

obligated to advance on the dealer's behalf to the manufacturer, distributor or seller" and that the

Debtor did not do so.  Because the summary judgment motion is devoid of any facts suggesting

that the Debtor made any false representation to GMAC (other than those relating to his financial

condition, such representations being excluded from the scope of 523(a)(2)(A)),[21] the Motion

must be denied.  See, e.g., In re Guthier, 2010 WL 1443989, at *7 (Bankr. N.D.N.Y. Apr. 9,

2010); In re Zalusky, 2004 WL 5677099, at *4 (Bankr. N.D.N.Y. Apr. 1, 2004); In re Iaquinta, 95

B.R. 576, 578 (Bankr. N.D. Ill. 1989).[22]

### B.

       Section 523(a)(2)(B) of the Bankruptcy Code excepts from discharge a debt:

---

[21]       As the court noted in In re Lucas:

> If a statement falls within the category of "statement[s] respecting the debtor's . . .
> financial condition," it is expressly excluded from subsection (A); and in order to
> be actionable under subsection (B), must be a statement in writing. 11 U.S.C. §
> 523(a)(2)(A) and (B).

386 B.R. 332, 336 n.5 (Bankr. D.N.M. 2008).  In this respect §523(a)(2)(A) and §523(a)(2)(B) are
mutually exclusive.  See, e.g., In re Vann, 67 F.3d 277, 282 n.6 (11th Cir. 1995); In re Ophaug, 827 F.2d
340, 342-43 (8th Cir. 1987).

[22]       GMAC also may be suggesting that the Debtor committed a fraud by causing Exton
Motors to enter into the floor plan relationship with GMAC "without an intent to repay."  See GMAC's
Mem. of Law at 6.  If this is GMAC's contention, there is no evidence in the record to support such a
finding.

for money, property, services, or an extension, renewal, or refinancing of credit, to the
extent obtained by—

. . .

> (B) use of a statement in writing—

> > (I) that is materially false;

> > (ii) respecting the debtor's or an insider's financial condition;

> > (iii) on which the creditor to whom the debtor is liable for such money,
> > property, services, or credit reasonably relied; and

> > (iv) that the debtor caused to be made or published with intent to deceive . . . .

11 U.S.C. §523(a)(2)(B).  To succeed under §523(a)(2)(B), a creditor must prove that the debtor

provided a written statement "(1) that is materially false; (2) respecting his financial condition;

(3) upon which [the creditor] reasonably relied; and (4) with the intent to deceive."  In re Cohn,

54 F.3d 1108, 1114, 1120 (3d Cir. 1995) The plaintiff bears the burden of proof on all four (4)

elements of the claim. Id. at 1114.

GMAC contends that it is entitled to summary judgment under §523(a)(2)(B) because the

Debtor "provided not one but two separate financial statements that were materially false, and

which GMAC relied [on] and [were] made with intent to deceive." (GMAC Mem. of Law at 7).

Presumably, GMAC bases its claim that the Financial Statements contained false financial

information on the facts that: (1) the Debtor disclosed assets with a much higher value in the

Financial Statements as compared to the later filed bankruptcy schedules and (2) the Debtor's

Financial Statements listed no contingent liabilities while, in his bankruptcy schedules, the Debtor

listed total liabilities of $3,455,669.70.

Assuming arguendo that GMAC has established the falsity of the Debtor's asset and

-19-

liability disclosures,[23] the Motion flounders on the "intent" element of the §523(a)(2)(B) claim for several reasons.

First, there is insufficient evidence in the record to support the necessary finding regarding the Debtor's intent to deceive. Certainly, a court may infer a debtor's fraudulent intent from the "totality of the circumstances." Cohn, 54 F.3d at 1118-19. In addition, proof of the falsity of a debtor's representations combined with other undisputed facts regarding the circumstances in which the representations were made may permit a court to infer that a moving party has met its burden of proof on the issue. See, e.g., In re Gertsch, 237 B.R. 160, 165 (B.A.P. 9th Cir. 1999) (summary judgment on issue of intent "is appropriate if all reasonable inferences defeat the claims of one side") (quoting Newman v. Checkrite California Inc., 912 F. Supp. 1354, 1380 (E.D. Cal.1995)).

Here, however, the summary judgment record contains no details regarding the setting and circumstances in which the Debtor delivered the Financial Statements to GMAC. At best, the record establishes only that there may have been material misstatements in the Debtor's Financial Statements. The misstatement, by itself, is insufficient to establish that a debtor intended to deceive the creditor. See Cohn, 54 F.3d at 1119-20 (rejecting principle that proof of falsity in

---

[23]    I emphasize that this is just an assumption and not a finding.

The April 2007 Financial Statement was provided to GMAC more than three (3) years before the bankruptcy disclosures were made; the December 2008 Financial Statement was provided to GMAC more than seven (7) months before the bankruptcy disclosures. Certainly, the disclosure of a significant diminution in a debtor's assets in his or her bankruptcy schedules as compared to the disclosure in a financial statement published relatively close in time prior to the bankruptcy filing raises a legitimate issue under §523(a)(2)(B). However, the mere existence of discrepancies does not necessarily establish that the pre-bankruptcy disclosures were false. It is possible that the prepetition disclosures were accurate and that circumstances changed in the interim before the bankruptcy case was filed. It also is possible that the prepetition disclosures were accurate and the bankruptcy disclosures were not.

-20-

financial statement creates a rebuttable presumption that the debtor had the intent to deceive).

Morever, proof of fraudulent intent is not especially susceptible to disposition by summary judgment.[24]  Given the paucity of the record as described above, I am reluctant to draw the inference that any nondisclosure was the product of the Debtor's fraudulent intent.   Without a further factual context, the record is not "so one sided that reasonable minds could not differ" on the question of whether the Debtor acted with fraudulent intent.  In re Okan's Foods, Inc., 217 B.R. 739, 755 (Bankr. E.D. Pa. 1998).  Therefore, GMAC has not met its burden of proof on the issue of intent for summary judgment purposes.

Even if the record on the intent issue were better developed, the Debtor has put the issue in dispute.  The Debtor expressly denies that he intended to defraud GMAC.   He also offers an explanation for the discrepancies in his pre-bankruptcy Financial Statements and his bankruptcy schedules.

For all of these reasons, this issue is best left for fact-finding at trial.[25]

---

[24]    See Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007) ("Issues such as intent and credibility are rarely suitable for summary judgment"); In re Swegan 383 B.R. 646, 655 (B.A.P. 6th Cir. 2008); In re Ruhe, 2005 WL 4030037, at *2 (Bankr. S.D. Ohio June 21, 2005) ("[i]n general, it is difficult to prevail on summary judgment when issues of subjective intent are involved"); In re Nobel, 179 B.R. 313, 316 (Bankr. M.D. Fla. 1995) (denying summary judgment as "inappropriate" because "the element of intent [is] involved in this claim"); In re Bartlett, 154 B.R. 827, 829 (Bankr. D.N.H. 1993) (summary judgment is granted "sparingly" where issues of intent are involved).

[25]    As an independent ground for denying summary judgment on GMAC's §523(a)(2)(B) claim (and assuming arguendo again that GMAC has established the falsity of the asset and liability disclosures), is that the record does not support a finding that GMAC reasonably relied on the Debtor's personal Financial Statements in extending credit to Exton Motors.

Under §523(a)(2)(B), the determination whether a creditor has reasonably relied on a financial statement

requires consideration of three factors:  (1) the creditor's standard practices in evaluating
(continued...)

## C.

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt "for fraud or

defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C.

§523(a)(4). This exception to discharge subdivides into two (2) parts. Nondischargeability based

on fraud or defalcation requires proof that the debtor was acting in a fiduciary capacity;

nondischargeability based on embezzlement or larceny does not. E.g., Alan N. Resnick & Henry

J. Sommer (eds.), 4 Collier on Bankruptcy ¶523.10[1][d], at 523-72 (16th ed. 2010) ("Collier"). In

a §523(a)(4) proceeding, the burden of proof is on the creditor. E.g., In re Baylis, 313 F.3d 9, 17

(1st Cir. 2002); In re Parks, 2007 WL 2033380, at *13 (Bankr. D. N.J. July 10, 2007); In re

Jurewicz, 2003 WL 21493987, at *3 (Bankr. E.D. Pa. June 25, 2003). But see In re Niles, 106

F.3d 1456, 1462 (9th Cir. 1997) (burden shifts to the debtor after creditor establishes debtor's

---

[25](...continued)

> credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

Cohn, 54 F.3d at 1118.

The only "evidence" of reliance in the record is the Debtor's statement, made in the Financial Statements themselves, that he understood that GMAC was relying on the information provided. It is questionable whether this evidence is even probative on the question because it is hardly likely that the Debtor had any first hand knowledge whether GMAC was, in fact, relying on his personal financial disclosures in extending credit to Exton Motors. In any event, the Debtor's recital in the Financial Statements in no way addresses the requirement that GMAC's reliance be reasonable. GMAC has presented no evidence that conforms to the standards the Court of Appeals articulated in Cohn for evaluating the reasonableness of its reliance. Therefore, GMAC has not met its burden of proof on the issue for summary judgment purposes. See In re Chryst, 177 B.R. 486 (Bankr. E.D. Pa. 1994).

fiduciary status).

Once again, GMAC's Motion is terse. Essentially, GMAC relies upon the Debtor's

admission in his Answer that he controlled the operations of Exton Motors as its owner, president

and principal and that Exton Motors sold a substantial number of vehicles floor planned by

GMAC, converted the proceeds and failed to pay GMAC. GMAC's Mem. of Law at 6-7; (see

also Complaint ¶¶ 3, 7; Answer ¶¶ 3, 7). I infer from GMAC's Memorandum of Law that GMAC

claims that the debt at issue is nondischargeable under §523(a)(4) based on fraud or defalcation

while acting in a fiduciary capacity (rather than based on embezzlement or larceny).[26]

Putting aside the question whether the admissions GMAC references establish, by

themselves, that the Debtor participated in a "fraud" or "defalcation,"[27] in its rush to judgment,

GMAC has overlooked the threshold requirement of proving the existence of a fiduciary

relationship.

In ascertaining whether a debtor was acting in a fiduciary capacity for purposes of

---

[26]    In support of its §523(a)(4) claim, GMAC cites Baylis, supra, and In re Ellison, 296 F.3d
266 (4th Cir. 2002). GMAC's Mem. of Law at 6. Both of these decisions involve claims of fraud or
defalcation while acting in a fiduciary capacity.

[27]    Nowhere has GMAC explained what fraud was committed by Exton Motors' failure to
turn over the proceeds from the sale of the vehicles. As for defalcation, that term refers to the failure of a
fiduciary to produce property entrusted to him. 4 Collier ¶523.10[b], at 523-71. In the Baylis decision
cited by GMAC, the court pointed out that there are three lines of authority "as to the standard for
measuring defalcation": (1) the fiduciary's innocent mistake is sufficient; (2) the fiduciary must have
been negligent; and (3) the fiduciary must have been at least reckless. 313 F.3d at 18. In Baylis, the
court adopted a fourth standard: "some degree of fault, closer to fraud, without the necessity of meeting a
strict specific intent requirement." Id. The court suggested that its standard "requires something close to
a showing of extreme recklessness." Id. at 20. But see In re Patel, 565 F.3d 963 (6th Cir. 2009) (declining
to follow Baylis and reaffirming a prior holding that recklessness is the standard). Under any of the
standards, other than, perhaps, "innocent mistake," GMAC's Motion would be inadequate in that there is
nothing in the record establishing the Debtor's negligence, recklessness or extreme recklessness. In any
event, because I deny GMAC's summary judgment request on this claim on other grounds, I do not reach
the issue of the appropriate standard for measuring defalcation under §523(a)(4).

-23-

§523(a)(4), certain legal principles are well established, most of them derived directly from the

Supreme Court's seminal case on the subject, Davis v. Aetna Acceptance Co., 293 U.S. 328

(1934).

      The definition of "fiduciary capacity" is a question of federal law, although the

bankruptcy court will look to state law, including state statutes, for guidance. E.g., In re Young,

91 F.3d 1367, 1371 (10th Cir. 1996); In re Stern, 403 B.R. 58, 66 (Bankr. C.D. Cal. 2009). The

term "fiduciary" for purposes of §523(a)(4) does not encompass every relationship that involves

elements of trust and confidence or an inequality in the parties' knowledge or bargaining power.

E.g., Young, 91 F.3d at 1371; Stern, 403 B.R. at 66. Rather, an express or technical trust must be

present for a fiduciary relationship to exist under §523(a)(4). E.g., Davis, 293 U.S. at 333;

Young, 91 F.3d at 1371; Mitsubishi Motor Sales of Caribbean, Inc. v. Ortiz, 418 B.R. 11, 23-24

(D.P.R. 2009); Guthier, 2010 WL 1443989, at *5. This requirement encompasses a trust created

by a formal trust agreement as well as a "trust-type obligation[] . . . imposed pursuant to statute

or common law." E.g., In re Bagel, 1992 WL 477052, at * 12 (Bankr. E.D. Pa. Dec. 17, 1992)

(citation omitted); 4 Collier ¶523.10[1][d], at 523-74 & n.23 (collecting cases).[28] The concept

does not extend to trusts ex maleficio (i.e., trusts implied by law arising from the act of

wrongdoing giving rise to the debt asserted to be nondischargeable).

      It is well established that, for the purposes of §523(a)(4), the debtor must have been a

fiduciary before the debt arose and acting in that capacity when the debt was created. E.g., Davis,

293 U.S. at 333; Young, 91 F.3d at 1372; Guthier, 2010 WL 1443989, at *5; Marques, 358 B.R.

---

[28]    In Pennsylvania, "an express trust is established when four elements are present: (1) an
express intent to create a trust; (2) an ascertainable res; (3) a sufficiently certain beneficiary; and (4) a
trustee who 'owns' and administers the res for the benefit of the beneficiary." E.g., In re Marques, 358
B.R. 188, 194 (Bankr. E.D. Pa. 2006).

at 194; In re Rountree, 2002 WL 832669, at *4 (Bankr. M.D.N.C. May 1, 2002); Bagel, 1992 WL

477052, at *13. Further, the §523(a)(4) discharge exception is not designed to apply to debts

arising from ordinary commercial or contractual relationships. Stern, 403 B.R. at 66; In re Grant,

325 B.R. 728, 734 (Bankr. W.D. Ky. 2005); Zalusky, 2004 WL 5677099, at *5. Finally, while

the use of the word "trust" in the written agreement between the parties is relevant in evaluating

whether a fiduciary relationship exists, it is not determinative. See Davis, 293 U.S. at 334; see

also In re Strack, 524 F.3d 493, 498 (4th Cir. 2008); Grant, 325 B.R. at 734; Zalusky, 2004 WL

5677099, at *5 (collecting cases).

There is no shortage of reported opinions applying these principles in cases where a

debtor failed to pay a creditor after selling the creditor's collateral.[29]  Many courts have looked to

Davis for guidance on the issue.  In the transaction in Davis, the debtor (an automobile dealer)

delivered to the creditor a note (providing for repayment in sixty (60) days), a chattel mortgage, a

bill of sale (purporting to convey absolute ownership of the automobile to the creditor) and a

"trust receipt" (by which the debtor agreed to hold the vehicle as the property of the respondent

for the purpose of storage, and not to sell, pledge, or otherwise dispose of it except upon consent

in writing).   The Court found that the "trust receipt" was insufficient to transform an ordinary

debtor-creditor relationship into a fiduciary relationship, concluding:

> Clearly the respondent's only interest in the car was as security for the debt. . . .  The
> substance of the transaction is this, and nothing more, that the mortgagor, a debtor, has
> bound himself by covenant not to sell the mortgaged chattel without the mortgagee's
> approval. The resulting obligation is not turned into one arising from a trust because
> the parties to one of the documents have chosen to speak of it as a trust.

---

[29]    Some of the decisions refer to the parties' agreement as a "floor plan." Frequently, the
term is not defined in the decisions. See n.5, supra for one court's definition of the term.

293 U.S. at 334.

Based on Davis, most courts have been reluctant to characterize a debtor as a fiduciary simply by virtue of the debtor's control of a business that has entered into a "floor plan" arrangement with a lender. E.g., In re Parr, 347 B.R. 561, 565 (Bankr. N.D. Tex. 2006); Grant, 325 B.R. at 734 (collecting cases); In re Tinkler, 311 B.R. 869, 877 (Bankr. D. Colo. 2004); In re Tester, 62 B.R. 486, 491 (Bankr. W.D. Va. 1986); see also In re Tsikouris, 340 B.R. 604, 611 (Bankr. N.D. Ind. 2006)  A few courts have distinguished Davis on its facts or have otherwise been persuaded that the parties' agreement and course of dealing created a trust relationship. See, e.g., Strack, 524 F.3d at 499-500.[30]

In deciding the Motion, I need not reach a final conclusion regarding the nature of the parties' relationship under §523(a)(4).  It is sufficient to find only that the present record does not support a finding of a fiduciary relationship.

The only documents in the summary judgment record governing the parties' relationship are the WSA and the amendments thereto.  On its face, the WSA is nothing more than a security agreement.  See n.4, supra.  Nothing in the WSA serves to distinguish the Debtor's relationship with GMAC from the debtor-creditor relationship that the Davis court held fell short of fiduciary

---

[30]    In Strack, the court reasoned that in Davis, the creditor asserted that the automobile itself was held in trust, whereas the agreement at issue in Strack obligated the debtor to keep the proceeds from the sale of the collateral in a separate fund for the creditor's benefit.  524 F.3d at 500-01; see also In re Stelluti, 163 B.R. 699 (Bankr. S.D.N.Y. 1994).

In attempting to distinguish fiduciary relationships from ordinary commercial relationships, courts also have found it useful to ascertain whether the debtor was obliged under the parties' agreement to segregate the proceeds from the sale of the collateral before making payment to the creditor.  See Zalusky, 2004 WL 5677099, at *5; Rountree, 2002 WL 832669, at *4.

relationship.[31] For this reason, summary judgment on GMAC's §523(a)(4) claim must be denied.


**D.**

Finally, GMAC seeks summary judgment under §523(a)(6).


**1.**

11 U.S.C. §523(a)(6) excepts from a debtor's chapter 7 discharge any debt a "for willful and malicious injury by the debtor to another entity or to the property of another entity." The key phrase in §523(a)(6) is "willful and malicious injury." The natural reading of this phrase requires that the terms "willful" and "malicious" be treated as distinct elements, with separate meanings in a §523(a)(6) nondischargeability proceeding, and courts have so construed the statute. See In re Barboza, 545 F.3d 702, 711-12 (9th Cir. 2008); In re Porter, 539 F.3d 889, 893 (8th Cir. 2008); 4 Collier ¶523.12[2], at 523-92. As explained below, certain analytic difficulties have arisen when courts have attempted to give meaning to both of the statutory terms.

In Kawaauhau v. Geiger, 523 U.S. 57 (1998), the Supreme Court instructed that the "word 'willful' in (a)(6) modifies the word 'injury,'" and therefore, nondischargeability requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Id. at 61. In the context of §523(a)(6), actions taken for the specific purpose of causing an injury as well as actions that have a substantial certainty of producing injury are "willful" within the meaning of §523(a)(6). In re Conte, 33 F.3d 303, 307-09 (3d Cir. 1994). Therefore, under

---

[31]     I am aware that the WSA incorporates by reference a document titled the GMAC Wholesale Plan. Perhaps that document includes provisions that further support GMAC's §523(a)(4) claim. However, it is not part of the summary judgment record.

§523(a)(6), for there to be a "willful" injury, "the Bankruptcy Code requires at least <u>a deliberate
action that is substantially certain to produce harm.</u>" <u>Id.</u> at 309 (emphasis added).[32]

---

[32]    In <u>In re Jacobs</u>, 381 B.R. 128, 137 n.18 (Bankr. E.D. Pa. 2008), I observed that although
<u>Conte</u> preceded the Supreme Court's decision in <u>Geiger</u>, it remains good law. I adhere to that view.

In <u>Jacobs</u>, I also observed that <u>Conte</u> does not explicitly address the question whether the
"substantially certain to produce harm" test is measured objectively or subjectively. The distinction was
well expressed in <u>In re Conner</u>, 302 B.R. 509, 514 (Bankr. W.D. Pa. 2003) (internal citations omitted):

> Under the subjective approach, an injury is willful and malicious for purposes of §
> 523(a)(6) only if the debtor subjectively intended to cause injury or subjectively believed
> that injury was a substantially certain consequence of his or her deliberate action.

> Under the so-called objective approach, an injury is willful for purposes of §523(a)(6)
> only if the debtor subjectively intended to cause injury or there was an objective
> substantial certainty of injury as a consequence of his or her deliberate action. Emphasis
> is placed under this approach on the assessment of the finder of fact of the likelihood of
> injury instead of the debtor's knowledge or belief..

In dicta in <u>Jacobs</u>, I stated that <u>Conte</u> "applied . . . what appears to be an objective test."
381 B.R. at 137. This comment in <u>Jacobs</u> may have been incorrect (although I do not decide the issue).

The <u>Conte</u> court reasoned that Congress adopted §523(a)(6)'s requirement of willful
injury against a common law background that is expressed in the Restatement (Second ) of Torts §8A
(1979) ("Restatement"). <u>Conte</u>, 33 F.3d at 307-08. The Court of Appeals quoted the Restatement: "If
the actor <u>knows</u> that the consequences are certain, or substantially certain, to result from his act, and still
goes ahead, he is treated by the law as if he had in fact desired to produce the result." <u>Id.</u> at 308 (quoting
Restatement §8A, Cmt. b.) (emphasis added). Upon further reflection, I consider it possible that this
passage from the Restatement relied upon by the <u>Conte</u> court may be more consistent with the subjective
test. Accord <u>In re Benun</u>, 386 B.R. 59, 77 (Bankr. D.N.J. 2008) ("taking the strongest cue from <u>Geiger</u>,
this court would, if compelled, apply the subjective standard . . . [of the] willfulness definition"); <u>aff'd in
part, vacated in part on other grounds,</u> 2008 WL 5084572 (D.N.J. Dec. 1, 2008) (not for publication),
<u>aff'd,</u> 328 Fed. Appx. 659 (Fed. Cir. 2009); <u>In re Whiters</u>, 337 B.R. 326, 346 (Bankr. N.D. Ind. 2006)
("Willful injury may . . . be established indirectly by . . . the debtor's knowledge that the conduct will
cause particularized injury"); Bryan Hoynak, <u>Filling in the Blank: Defining Breaches of Contract
Excepted from Discharge as Willful and Malicious Injuries to Property under 11 U.S.C. § 523(a)(6),</u> 67
Wash. & Lee L. Rev. 693, 712 n.114 (2010) (hereinafter, "Hoynak") ("The subjective approach appears
to be the more reasonable approach because allowing for debts to be 'willful' just because the act was
substantially certain to cause injury, without any analysis of the intentions of the debtor, seems to go
against the main principle of <u>Geiger</u> – an intentional injury is required").

In resolving the Motion on other grounds, it is unnecessary for me to choose sides in the
subjective/objective judicial debate with respect to the "willful injury" element of §523(a)(6).

Turning to the term "malicious," since 1898, most courts in bankruptcy nondischargeability proceedings have construed the term to refer to injuries "that are "wrongful and without just cause or excuse, <u>even in the absence of personal hatred, spite or ill-will.</u>" James William Moore (ed.), 1A <u>Collier on Bankruptcy</u> ¶17.17, at 1650.4 (14th ed. 1978) (referring to §17a of the former Bankruptcy Act); 4 Collier ¶523.12[2], at 523-92 (emphasis added); <u>see also</u> <u>Printy v. Dean Witter Reynolds, Inc.</u>, 110 F.3d 853, 859 (1st Cir. 1997); <u>In re Stelluti</u>, 94 F.3d 84, 87 (2d Cir. 1996).

> Malice does not mean the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside of bankruptcy. In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same.

<u>In re Wooten</u>, 423 B.R. 108,130 (Bankr. E.D. Va. 2010) (internal citations omitted) (quoting <u>In re Davis</u>, 262 B.R. 663, 670-71 (Bankr. E.D. Va. 2001)); <u>accord</u> <u>In re Stanley</u>, 66 F.3d 664, 667 (4th Cir. 1995).[33]

As stated at the outset, this general expression of the statutory concept of maliciousness creates an analytic problem when considered against the backdrop of the construction given to the term "willful." As one commentator has observed:

> "[M]alicious" needs some interpretation that adds to the definition of "willful."

---

[33]    There are courts that analyze the relationship between "willful" and "malicious" differently, limiting the concept of "willful" to a requirement that the debtor took voluntary, deliberate action and imbuing the term "malicious" with the requirement that the injury be intended. <u>See, e.g.</u>, <u>In re Becker</u>, 423 B.R. 883, 887 (Bankr. E.D. Mo. 2010); <u>In re Bren</u>, 284 B.R. 681, 699 (Bankr. D. Minn. 2002); <u>see also</u> <u>In re Jercich</u> 238 F.3d 1202, 1208-09 (9th Cir. 2001) (seemingly requiring that the injury be intended to be a requirement of both willfulness and maliciousness). In one passage in <u>Jacobs</u>, I described the terms willful" and "malicious" similarly. <u>See</u> 381 B.R. at 138 ("To be 'willful,' the debtor's actions must have been voluntary and deliberate. To be 'malicious,' the debtor's actions either must have been taken with the specific goal of causing harm to the creditor or must have been substantially certain to have caused harm."). However, in my view, the correct analysis under the precedents binding on this court is expressed in the text above.

"Willful" after <u>Geiger,</u> however, requires an intent to injure − that is, both an intentional act <u>and</u> an intentional injury. <u>The Court in Geiger defined willful to include wrongful behavior</u>. Malicious, however, traditionally incorporates the element of wrongdoing, so confusion surrounds the new role of the term malicious − <u>how much more wrongdoing does malicious require in order for an injury to be excepted under § 523(a)(6)</u>?

Hoynak at 713-14 (footnotes omitted) (emphasis added).

The expression of "malice" in terms of wrongful behavior that is without just cause or excuse potentially is an extremely broad standard. <u>See Jacobs,</u> 381 B.R. at 139.[34] In the substantial body of case law concerning §523(a)(6), there are a number of different principles that courts have suggested are inherent in the concept of "malicious" injury that may narrow its potentially expansive scope.

As a starting point, some courts have suggested that §523(a)(6) is limited to injuries arising from tortious activity, as opposed to a mere breach of contract. <u>In re Riso,</u> 978 F.2d 1151, 1154 (9th Cir.1992); <u>In re Williams,</u> 362 B.R. 838, 840-841 (Bankr. N.D. Ohio 2006). Additionally, the existence of a tort as the source of liability is not, by itself, sufficient to render a debt nondischargeable. "[T]he (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts." <u>Geiger,</u> 523 U.S. at 61-62. "An intentional breach of contract is excepted from discharge under § 523(a)(6) only when it is accompanied by malicious and willful tortious conduct." <u>Ortiz,</u> 418 B.R. at 25 (quoting <u>Riso,</u> 978

---

[34]    In the abstract, the concepts of "wrongfulness" and "without just cause" seem very broad. Indeed, virtually every judicial liability determination is based on a party's having taken some action he should not have taken (or failed to take some action that he or she should have taken). In some sense, then, a judicial liability determination is always based on "wrongful" conduct. How then to distinguish between wrongful conduct that is dischargeable and wrongful conduct that is nondischargeable under § 523(a)(6)?

<u>Jacobs,</u> 381 B.R. at 139.

F.2d at 1154).

Courts also have invoked different standards for determining whether an intentional tort involved "malice" within the meaning of §523(a)(6).  For example in In re Long, 774 F.2d 875, 881 (8th Cir. 1985), the court reasoned that, for the debt for any injury arising from an intentional tort to be nondischargeable under §523(a)(6), the debtor's conduct must be "more culpable than that which is in reckless disregard of creditors' economic interests and expectancies."  Further, in assessing the debtor's culpability, "knowledge that legal rights are being violated is insufficient to establish malice, absent some additional 'aggravated circumstances'. . . ." Id.  Other courts, too, have stated that the existence of "aggravating circumstances" and a conscious disregard of one's societal duties to others are essential aspects of the malice requirement under §523(a)(6). See, e.g., In re Logue, 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003); In re Richardson, 2007 WL 2381990, at *6-7 (Bankr. N.D. Ala. Aug. 17, 2007); In re Weiser, 2007 WL 4868319, at *2 (Bankr. N.D. Ind. Apr. 4, 2007); In re Hambley, 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005); In re Blankfort, 217 B.R. 138, 143-45 (Bankr. S.D.N.Y. 1998).

In this unsettled area of the law, one court has summarized the differing standards for malice as follows:

> One standard requires proof from the creditor that the debtor acted with the specific intent to injure the creditor.  A second view is that the creditor need only prove that the debtor acted without just cause or excuse.  A third approach requires that the debtor's conduct target the creditor, at least in the sense that the conduct was certain or almost certain to cause financial harm.  A fourth approach, which has been characterized as a "totality of the circumstances" approach, adopts the position that an injury is malicious if the debtor fails to act in subjective good faith.

In re Pineau, 149 B.R. 239, 242 (D. Me. 1993) (emphasis added) (citing In re Horldt, 86 B.R. 823

-31-

(Bankr. E.D. Pa. 1988)).

**2.**

A common fact pattern in §523(a)(6) proceedings involves a secured creditor's claim that a debtor's conduct, in violation of loan and security documents, diminished, impaired or extinguished the creditor's collateral, thereby inflicting a "willful and malicious injury" to the creditor's property. The number of reported cases of this nature is legion, with the outcomes divided.[35]

Because conduct that impairs a creditor's collateral is rooted in the parties' contractual arrangement that created the creditor's property interest in the collateral, analyzing §523(a)(6) cases of this nature "can be a perplexing exercise," In re Trantham, 286 B.R. 650, 663 (Bankr. W.D. Tenn. 2002), rev'd, 304 B.R. 298 (B.A.P. 6th Cir. 2004), presenting "unique conceptual difficult[ies]." Whiters, 337 B.R. at 345.

The seminal case on the subject (again) is Davis v. Aetna Acceptance Co., decided under §17a of the former Bankruptcy Act, in which the Supreme Court stated:

> There is no doubt that an act of conversion, if willful and malicious, is

---

[35]    As early as 1990, one bankruptcy court observed:

> The question whether or not a corporate officer who guaranteed a corporate obligation would be liable for a nondischargeable debt for violating financing arrangements such as a floor plan or for unauthorized disposition of collateral has been subject to extensive litigation in the past. It is not surprising that the courts are in disagreement on this issue. Some held that an unauthorized disposition of a collateral or a failure to abide by the terms of a floor plan arrangement and to remit the funds to the financier is sufficient to sustain a claim of nondischargeability under §523(a)(6) of the Bankruptcy Code. Some other courts arrived at a different conclusion.

In re Morrison, 110 B.R. 578, 582 (Bankr. M.D. Fla. 1990) (citations omitted).

> an injury to property within the scope of this exception. . . . But a willful
> and malicious injury does not follow as of course from every act of
> conversion, without reference to the circumstances. There may be a
> conversion which is innocent or technical, an unauthorized assumption
> of dominion without willfulness or malice.  There may be an honest
> but mistaken belief, engendered by a course of dealing, that powers
> have been enlarged or incapacities removed. In these and like cases,
> what is done is a tort, but not a willful and malicious one.

293 U.S. at 332 (citations omitted).

In light of Davis, there appear to be two propositions on which there is some judicial consensus in §523(a)(6) nondischargeability cases involving impairment of a secured creditor's collateral.  First, most courts do not categorically rule out the possibility that a purposeful breach of a contract, in some circumstances, can cause a willful and malicious injury, particularly if the breach is accompanied by a tortious act, such as conversion.  Second, "[s]imply because the sale [of the collateral] was in violation of the security agreement and was in fact an intentional sale on the part of debtor should not be enough to trigger a finding of malice." In re Grier, 124 B.R. 229, 233 (Bankr. W.D. Tex. 1991); see In re Armstrong, 2006 WL 2850527, at *11 (Bankr. D. Idaho Oct. 3, 2006) ("if the conversion of collateral is done through an honest but erroneous belief there is authority to sell or dispose of collateral and use the proceeds, even if such conduct can be viewed as negligent, unreasonable or reckless, the resultant liability to the secured creditor is dischargeable under § 523(a)(6) because the requisite intent to cause injury is lacking"); see also In re Longley, 235 B.R. 651 (B.A.P. 10th Cir. 1999).  The difficulty, then, is determining what renders the injury to a creditor's property "malicious" and therefore, nondischargeable under §523(a)(6).

The differing outcomes in the many reported cases on the subject can be explained in at least two ways.

-33-

First, not surprisingly, the particular factual circumstances giving rise to the impairment of the creditor's collateral may influence the court's evaluation of the debtor's conduct under §523(a)(6). See generally Whiters, 337 B.R. at 345 ("the key in conversion cases is to analyze each set of circumstances on a case-by-case basis to determine whether the conversion is in the nature of an intentional tort or whether the conversion is a result of a negligent or reckless tort – but not willful or malicious") (quoting In re Kidd, 219 B.R. 278, 284 (Bankr. D. Mont. 1998)).

Second, courts have applied different levels of scienter in evaluating a debtor's conduct under the "malice" element of §523(a)(6), discussed above in Part IV.D.1. For the debt to be nondischargeable, must the debtor have had the specific intent to harm the creditor?[36] Or, can malice also be established simply through "evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights."[37] Is it enough that the debtor was aware of the contractual obligation, breached the obligation and impaired the creditor's collateral without an excuse?[38]

Whatever, the precise scienter standard may be – and I need not reach that issue to decide the Motion before me – all of the tests for determining the existence of "malice" require some

---

[36]    See, e.g., In re Woods, 418 B.R. 226, 230-31 (Bankr. W.D. Ky. 2009), aff'd, 2010 WL 2305484 (W.D. Ky. June 7, 2010); In re Cremeans, 2009 WL 763615, at *7-8 (Bankr. D.N.D. Mar. 19, 2009); In re Breedlove, 2007 WL 2034143, at *18 (Bankr. N.D. Okla. July 9, 2007); Bren, 284 B.R. 699.

[37]    See, e.g., In re Posta, 866 F.2d 364, 367 (10th Cir. 1989). I note that in In re Longley, the bankruptcy appellate panel opined that Posta was overruled by the Supreme Court's decision in Geiger, regarding the precise nature of the scienter requirement. 235 B.R. at 656.

[38]    See Ford Motor Credit Co. v. Owens, 807 F.2d 1556, 1559-60 (11th Cir. 1987); In re Deresinski, 216 B.R. 995, 1000 (Bankr. M.D. Fla. 1998) (collecting cases); In re Black, 179 B.R. 509, 515-16 (Bankr. E.D. Tex. 1995).

-34-

proof regarding the debtor's state of mind.[39]  The question in this proceeding is whether GMAC

has met its burden of proof on summary judgment to establish "malicious" injury.  Therefore, I

must consider whether there is undisputed evidence regarding the Debtor' scienter sufficient to

support a finding of "malice."

GMAC relies upon the Debtor's admission in his Answer that he controlled the operations

of Exton Motors as its owner, president and principal and that Exton Motors "sold a substantial

number of vehicles floor planned by GMAC, converted the proceeds and failed to pay GMAC."

GMAC Mem. of Law at 6-7.  GMAC appears to suggest that proof of "the sale/conversion of a

lender's vehicles out-of-trust" is sufficient to establish its §523(a)(6) claim.  Id. at 6 (citing In re

Shaffer, 305 B.R. 771 (Bankr. D.S.C. 2004)).  Respectfully, I disagree.

Even assuming that the present record supported findings that the Debtor caused Exton

Motors to convert GMAC's property,[40] there is no inflexible rule that all sales "out of trust" are

---

[39]    See Armstrong, 2006 WL 2850527, at *11 ("a host of . . . cases . . . support the basic
premise that intent matters"); see also Whiters, 337 B.R. at 345 ("the key in conversion cases is to analyze
each set of circumstances on a case-by-case basis to determine whether the conversion is in the nature of
an intentional tort or whether the conversion is a result of a negligent or reckless tort -- but not willful or
malicious") (quoting Kidd, 219 B.R. at 284); In re Wright, 299 B.R. 648, 661 (Bankr. M.D. Ga. 2003)
("Depending on the circumstances and the course of dealings between the parties, a conversion of
collateral or proceeds of collateral may be willful and malicious").

[40]    As the court noted in In re Hyland,

> Pennsylvania law defines the tort of conversion as "the deprivation
> of another's right of property, or use or possession of a chattel, or
> other interference therewith, without the owner's consent and without
> lawful justification." Moreover, it is well established under Pennsylvania
> law that money may be the subject of conversion.

2000 WL 1210822, at *6 (Bankr. E.D. Pa. Aug. 17, 2000) (internal citations omitted); accord Carter v.
Morrison, 2010 WL 701799, at *19 (E.D. Pa. Feb. 24, 2010).  Further, Pennsylvania law recognizes that
the tort of conversion lies against a debtor who "disposes of collateral which has been subjected to a
perfected security interest." E.g., Chrysler Credit Corp. v. Smith, 643 A.2d 1098 (Pa. Super. Ct. 1994).
Under the "participation theory," an officer of a corporation can be held personally liable for conversion

(continued...)

-35-

inherently "willful and malicious" under §523(a)(6).  See, e.g., Richardson, 2007 WL 2381990, at

*7.  Some evidence regarding the circumstances in which the asserted misappropriation took place

is essential to support a finding of malice.

    As the party bearing the burden of proof under §523(a)(6), see, e.g., In re Burke, 416 B.R.

136, 143 (Bankr. E.D. Pa. 2009); In re Lahiri, 225 B.R. 582, 586 (Bankr. E.D. Pa. 1998),  it was

incumbent on GMAC to develop the summary judgment record to support the asserted "malicious"

nature of the Debtor's conduct.  Having failed to do so, the Motion must be denied.  See In re Kim,

2008 WL 2705082, at *3-4 (Bankr. E.D. Va. July 9, 2008); Ruhe, 2005 WL 4030037, at *2;

Nobel, 179 B.R. at 316; Morrison, 110 B.R. at 582.


## VI.

    For the reasons set forth above, the Motion will be denied in its entirety.


Date:  July 29, 2010

                                     **ERIC L. FRANK**
                                     **U.S. BANKRUPTCY JUDGE**


cc:    Gerald Coley
        158 Applegate Drive
        West Chester, PA 19382

---

[40](...continued)
if he or she acted on behalf of the corporation and got no benefit.  Markert v. Becker Technical Staffing,
Inc., 2010 WL 1856057, at *8 (E.D. Pa. May 7, 2010).